# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**OPERATING ENGINEERS LOCAL 139
HEALTH BENEFIT FUND,**

**CENTRAL PENSION FUND OF THE
INTERNATIONAL UNION OF
OPERATING ENGINEERS AND
PARTICIPATING EMPLOYERS,**

**WISCONSIN OPERATING ENGINEERS
SKILL IMPROVEMENT AND
APPRENTICESHIP FUND, and**

**DALE A. MILLER,**                                                         Case No. 02-C-924
**as Trustee,**

           **Plaintiffs,**

   v.

**ALL-WAYS COMPANIES, INC., and
ALL-WAYS CONTRACTORS, INC.,**

           **Defendants.**

### ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

#### INTRODUCTION

The pending action was initiated against defendant All-Ways Companies Inc. ("Companies") by: (1) Operating Engineers Local 139 AFL-CIO Health Benefit Fund, (2) Central Pension Fund of the International Union of Operating Engineers and Participating Employers, (3) Wisconsin Operating

Engineers Skill Improvement and Apprenticeship Fund, (4) International Union of Operating Engineers Local 139 AFL-CIO ("International"), and (5) Dale A. Miller, as trustee for the funds.

The plaintiffs seek fringe benefit contributions and other related damages, pursuant to a series of collective bargaining agreements, known individually as the Memorandum of Agreement, the Heavy and Highway Construction Agreement (or Master Agreement), the Letter of Understanding, and the Landscape Addendum. These agreements were signed by defendant-Companies and plaintiff-International on October 21, 1998 and were carried out until October 2001. (Dea Michels Aff.). Plaintiffs claim that Companies contributions should have been paid through June 1, 2004 and set forth two claims against Companies in their initial complaint: one based on the Employee Retirement Income Security Act ("ERISA") and one based on the Labor-Management Relations Act.

On May 12, 2004, the plaintiffs amended their complaint to add All-Ways Contractors, Inc. ("Contractors") as Companies' alter ego. In addition, the plaintiffs added a count against Dea and Chris Michels, individual shareholders and corporate officers of the defendant corporations, under Wisconsin's theft by contractor statute. However, since the filing of the amended complaint, the parties have twice stipulated to dismiss certain claims and parties. Only count one of the amended complaint, which sets forth the plaintiffs' ERISA claim remains. Accordingly, Dea and Chris Michels, who were named in relation to a dismissed count, are no longer defendants in this suit. For the same reason, plaintiff International, named in only the Labor-Management Relations Act count, has also been dismissed. The remaining plaintiffs will hereinafter be referred to collectively as "the Funds."

Contractors and Companies deny liability based on the remaining ERISA claim for two reasons. First, the defendants claim that a letter dated June 28, 2001 gave timely notice that the agreements were terminated and therefore alleviated any former obligation to make contributions to the Funds. (Ans. to Amd. Compl. ¶ 3, and affirmative defense ¶ C.). In addition, the defendants claim that, under 29 U.S.C. §§ 157 and 158, the agreements were illegal and void at their inception because International's bargaining authority was not recognized by a majority of employees. In regard to this second defense, the defendants acknowledge the exception to the rule requiring majority employee support, which is set forth at 29 U.S.C. § 158(f), also referred to as § 8(f) of the National Labor Relations Act. The § 158(f) exception allows agreements with labor organization for which majority status has not been established *if* the employees covered by the agreement are "engaged in the building and construction industry." Contractors and Companies claim that the § 158(f) exception does not apply in this case because their primary business pursuits involved activities that would not be classified as building and construction. ( Def. Br. 2; Ans. to Amd. Compl. ¶¶ 3, 8, and affirmative defenses ¶¶ B &C.).

These defenses were asserted in the defendants' amended answer as well as in response to the Funds' motion for partial summary judgment, filed on February 28, 2005. That motion has been fully briefed and is now ready for resolution. Jurisdiction to resolve the Funds' ERISA claim is proper based upon the existence of federal questions. 28 U.S.C. § 1331. The case was randomly assigned to this court, and the parties have consented to exercise of full jurisdiction by a magistrate judge, including the entry of final judgment. A court trial to is scheduled to commence on August 8, 2005, with a final pretrial conference set for July 28, 2005.

## STATEMENT OF FACTS

In support of, and in opposition to, the Funds' motions for summary judgment, the parties have submitted proposed findings of fact. A review of the proposed findings reveals that many of the critical facts for summary judgment purposes are undisputed. A summary of those facts follows.

On February 20, 2003, upon the stipulation of all parties, this case was consolidated with Eastern District case number 02-C-780, which was pending before the Honorable William E. Callahan, for purposes of deciding the binding effect of the collective bargaining agreement. In case number 02-C-780, International sought to compel arbitration of a dispute with Companies under the same collective bargaining agreements that gave rise to the instant suit. A key issue that would affect both cases was whether Companies was bound to a collective bargaining agreements. On July, 23, 2003, Judge Callahan resolved that issue in favor of International, holding that Companies was bound to the agreements and that no valid notice of termination was given. Int'l Union of Operating Eng'rs v. All-Ways Companies, No. 02-C-780 at 12-13 (E.D. Wis. July 23, 2003)(Order). Judge Callahan's decision was based on the undisputed facts and unopposed motion for summary judgment filed by International.

The defendants concede that Judge Callahan's decision precludes Companies from raising any defense to the Funds' ERISA claim that could have been presented in opposition to International's motion for summary judgment. (Def. Br. 3.). However, Companies is apparently an assetless corporation. (Id.). In addition, even though Companies signed the collective bargaining agreements and represented that it had employees on contribution forms given to the Funds (Callahan Order at 5), it now appears that Contractors — and not Companies — employed workers covered by the agreements. As stated earlier, both corporate entities have the same shareholders, officers and

4

directors, namely Chris and Dea Michels. Based on these facts, as well as Contractor's payments to the Funds on behalf of Companies, all parties agree that Contractors and Companies should be classified as "alter ego" corporations. (Amd. Compl. ¶ 9; Def. Resp. Br. 3; Def. Resp. to Proposed Findings of Facts ¶ 17.).

There is a dispute regarding when the Funds became aware of the defendants' alter ego status. The defendants claim that the Funds knew of the alter egos status when the contributions were still being made. (Def. Resp. Br. 2.). The Funds deny knowledge at that time and claim that they never suspected that Contractors had been carrying out the bargaining agreements until after Judge Callahan granted International's motion for summary judgment. (Funds Reply 4, n. 1.). At that time, the Funds sought an audit of Companies' payroll books and records to determine whether the hours that Companies reported to the Funds were in fact the true hours worked by the employees. On August 13, 2003, this court ordered the audit be conducted. After contempt proceedings were instituted for Companies' failure to comply with the court's order directing the audit, Companies claimed that it had no employees or payroll records and that Contractors had been carrying out the agreement in the name of Companies. Depositions of the Michels' were then taken and shortly thereafter, the Funds amended their complaint to include Contractors and to assert that the two defendant corporations are alter egos. The current posture of the case followed.

### THE FUNDS' MOTION FOR PARTIAL SUMMARY JUDGMENT

The Funds submitted four arguments in support of their motion for partial summary judgment. First, the Funds claim that the defendants waived any defense to the ERISA claim based on their alter ego status and Companies' failure to assert the defenses in the summary judgment motion decided by Judge Callahan. (Funds Br. 7-8; Funds Reply 4.). Alternatively, the Funds claim that the asserted

5

defenses are insufficient to prevent summary judgment because liability under ERISA exists even if International was not a recognized union by a majority of employees. (Funds Br. 4-6.). Third, the Funds claim that any defense based on the alleged letter of termination is invalid, for reasons discussed in Judge Callahan's order granting summary judgment. (Funds Br. 7-8.). And finally, the Funds claimed that contract defenses asserted by Contractors fail because Contractors did not sign the agreements. (Funds Br. 8-9.). That last claim was asserted in response to Contractors' initial denial of its alter ego status (Ans. to Amd. Compl. ¶ 9.), is no longer relevant, and will not be discussed further. The remaining three claims will be discussed in detail below.

## SUMMARY JUDGMENT STANDARD OF REVIEW

A motion for summary judgment will be granted when there are no genuine issues as to material fact and the movant is entitled to judgement as a matter of law. FED. R. CIV. P. 56(c). As provided under Rule 56(c), only "genuine" issues of "material" fact will defeat an otherwise "proper" motion for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[M]aterial facts are those facts which, under the governing substantive law, "might affect the outcome of the suit." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. Id.

The movant bears the burden to establish that summary judgment is proper. FED. R. CIV. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970); see also Celotex Corp., 477 U.S. at 323. The moving party satisfies its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson, 477 U.S. at 255; Cain v.

Lane, 857 F.2d 1139, 1142 (7th Cir. 1988); Spring v. Sheboygan Area School Dist., 865 F.2d 883, 886 (7th Cir. 1989). Further, "on summary judgment, a court can neither make a credibility determination nor choose between competing interests." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir. 1993).

If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

## ANALYSIS

For several reasons, this court will grant the Funds' motion for partial summary judgment. As an initial matter, it is clear that the factual findings and legal conclusions reached by Judge Callahan when the cases were consolidated are binding on both Contractors and Companies. As mentioned earlier, the parties agree that Contractors and Companies are alter egos. That agreement is sufficient to resolve the Funds' summary judgment motion. As alter egos, Companies and Contractors are essentially the same party. The actions of one constitute the actions of the other, and the interests of the two could not be closer. Thus, Contractors had as much at stake and was as much involved in the decision by Judge Callahan as was Companies.

Contractors, however, contends that, despite being Companies' alter ego, it should not be bound by Judge Callahan's decision because Companies was not its "virtual representative" (Def. Resp. Br. 4-6; Def. Resp. to Proposed Findings of Fact ¶ 1.) Contractors contends that Companies did nothing to protect the legal position of its alter ego. Contractors claims that Companies stood silent before Judge Callahan and therefore, did not act as Contractors' virtual representative. Virtual representation in the context of claim preclusion or issue preclusion was discussed at length by the

7

Seventh Circuit in Tice v. American Airlines, Inc., 162 F.3d 966 (7th Cir. 1998). The defendants cite Tice in support of their position, but fail to recognize the Tice court's primary holding—that the "virtual representation" doctrine adds nothing to an analysis of whether an unnamed party should be bound by a previous decision. Id. at 971. The virtual representation doctrine, which originated in the field of probate proceedings, was deemed to "cast more shadows than light" on the issue of preclusion. Id. at 970, 971. Accordingly, in determining whether issue or claim preclusion should prevent subsequent litigation, the court must instead look to the doctrine of privity. Privity is the term designating those with a sufficiently close identity of interests. Kunzelman v. Thompson, 799 F.2d 1172, 1178 (7th Cir. 1986). Then, if the prior and current litigants are aligned by privity, the court can apply res judicata or claim or issue preclusion. Such an analysis is not necessary in this case since the defendants are alter egos; there is an identity of interests. The court need not inquire into the less demanding classification of privity.

Ultimately, courts address issues that have previously been litigated or that could have been previously litigated to ensure that every person "have his own day in court." Tice, 162 F.3d at 972 (citing Richards v. Jefferson County, 517 U.S. 793, 798 (1996)). Chris and Dea Michels operated both entities. When the issue of the binding effect of the collective bargaining agreement was raised, Companies had the opportunity to raise all legal defenses, including those now being asserted by Contractors. It is simply disingenuous to argue that these alter ego entities somehow have split personalities, with one being able to take actions to which the other is oblivious. Companies and Contractors are not Dr. Jeckyl and Mr. Hyde. Contractors is not able to avoid the actions or inactions taken by Companies; it will not be permitted to sit back, wait until audit contempt proceedings had been initiated against Companies before revealing its involvement in the dispute, and at that point,

8

raise additional defenses. The very purpose of the alter ego doctrine is to prevent a corporation from shielding itself with the protective mantle of the corporate forum. Lumpkin v. Envirodyne Industries, Inc., 933 F.2d 449, 459 (7th Cir. 1991). That is exactly what Contractors intends to do by claiming no ties to the Callahan decision and advancing its defenses at this late date.

The circumstances might be different if International knew about the defendants' alter ego status and failed to join Contractors at the outset of litigation or made a strategic decision not to do so. However, there is no evidence that International had that knowledge. While the defendants argue that position in opposition to the Funds' summary judgment motion, the only evidence cited by the defendants consists of statements about Contractors' income distribution and testimony by Chris and Dea Michels that Companies had no income, had no employees, and made payments to the Funds drawn from Contractors' bank account. (Def. Br. 2 citing Exh. 29, 30, 32, and 34; Def. Br. 6 citing Exh. 32-34 and Resp. to Funds' Proposed Findings of Fact 1, 6, 9, 11, and 17.). All of these statements were made in March and February of this year, long after the Callahan decision.

In addition, the statements do not lead to the conclusion that International or the Funds knew Contractors and Companies were alter egos at all times relevant here. In fact, the defendants' answer to the amended complaint, which was filed on May 20, 2004 long after Judge Callahan's decision had been issued, denied that Companies and Contractors are alter egos. (Ans. to Amd. Compl. ¶ 9.). Moreover, knowledge of the defendants' alter ego status and Companies' lack of employees at the time of the inception of both cases is further belied by the fact that International proceeded against Companies all the way to final judgment in the case before Judge Callahan, the plaintiffs filed a motion to compel an audit of Companies' records and sought to enforce that order via contempt proceedings in this case, and the plaintiffs promptly moved to amend their complaint shortly after they

9

claim to have been apprised of Contractors' role in this dispute. Accordingly, there is no "genuine" dispute—i.e. one supported by evidence such that a reasonable trier of fact could find in favor of the nonmoving party—as to International's knowledge of the defendants' alter ego status.

For all these reasons, Judge Callahan's determinations are binding in this case. This means that neither International nor its representative received the June 28, 2001 letter that the defendants allege cancelled the Agreements. (Callahan Order 8.). In addition, even if the letter had been received, the letter would not terminate the Agreements, as its notice was untimely. (Callahan Order at 12-13.). These conclusions defeat the defendants' first defense, which will not be discussed further. The remaining defense, that the agreements were void at their inception, is defeated for similar reasons. Companies (and Contractors as its alter ego) already had the opportunity to argue that International was not supported by a majority of employees and that the defendants were not "engaged in the building and construction industry." That opportunity has now passed, as Judge Callahan has already determined that the Agreements are binding. (Callahan Order at 13.).

Moreover, the second ERISA defense is precluded by the Seventh Circuit Court of Appeals' holding in Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc., 870 F.2d 1148 (7th Cir. 1989). In Gerber Truck, a multi-employer pension plan brought suit to collect pension and welfare benefits required by a series of collective bargaining agreements. Id. at 1150. The signatories of the agreements, Gerber Truck and Teamsters Local 50, intended the agreements to require contributions on behalf of only three Gerber Truck employees. They had an oral understanding to this effect and Gerber Truck only made contributions for the three employees involved. However, the written agreements signed by Gerber Truck were not limited to the three employees, as Gerber Truck and Teamsters Local 50 believed. Rather, the agreements required Gerber Truck to make

10

contributions to the pension fund on behalf of all employees that fell into certain job classifications and that were represented by the union. Id. at 1150. Accordingly, the pension fund brought suit against Gerber Truck to enforce the agreements, as they were written.

In light of these facts, the Gerber Truck court framed the issue presented as follows: whether a pension fund can bring an ERISA claim to enforce a contract entered between an employer and a union, where (1) the contract requires the employer to make payments to the fund but (2) understandings and practices would prevent enforcement of the contract between the employer and the union. 870 F.2d at 1149. In resolving this issue, the Seventh Circuit recognized several policy considerations that arise when the plaintiff is a pension plan and is seeking to enforce a collective bargaining agreement. Id. at 1151. In particular, the court recognized that

> Plans rely on documents to determine the income they can expect to receive, which governs their determination of levels of benefits. Multi-employer plans are defined-contribution in, defined-benefit out. Once they promise a level of benefits to employees, they must pay even if the contributions they expected to receive do not materialize--perhaps because employers go broke, perhaps because they are deadbeats, perhaps ***because they have a defense to the formation of the contract.*** If some employers do not pay, others must make up the difference in higher contributions, or the workers will receive less than was promised. Costs of tracking down reneging employers and litigating also come out of money available to pay benefits. The more complex the litigation, the more the plan must spend.

Id. (emphasis added).

The court also recognized that Congress enacted § 515 of ERISA, 29 U.S.C. § 1145, specifically to address the financial hardship incurred by pension funds when an employer denies liability for contributions. Id. at 1152. Section 515 requires "[e]very employer who is obligated to make contributions to a multiemployer . . . under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and

11

conditions of such plan or such agreement." The Congressional record of § 515 is clear regarding the intent for the statute:

> [s]ome simple collection actions brought by plan trustees have been converted into lengthy, costly, and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions. This should not be the case. Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law--other than 29 U.S.C. 186. Sound national pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises.

Gerber Truck, 870 F.2d at 1153 (citing 126 Cong. Rec. 23039 (Rep. Thompson)). Based on these considerations, which are discussed further in Gerber Truck, the court held an employer's defenses to the formation of a collective bargaining agreement are inadequate against a pension plan. In fact, defects in contract formation such as fraud in the inducement, oral side agreement, course of performance, want of consideration, and *failure of the union to have majority support* were deemed the class of defenses most likely to breed litigation that § 515 seeks to avoid, even when the defenses are asserted in good faith. Id. at 1154; see also id. at 1152, 1153.

The application of Gerber Truck to the present case is apparent. Even if International lacked the support of a majority of employees and the defendants were not "engaged in the building and construction industry," and the bargaining agreements were therefore enforceable under § 158 of the Labor Management Relations Act, the defendants remain liable to the Funds. Clearly, this case—which has been ongoing for nearly three years—illustrates the precise situation that § 515 of ERISA was intended to avoid.

The defendants' reliance on J.W. Peters, Inc. v. Bridge, Structural and Reinforcing Iron Workers, Local Union 1, AFL-CIO, 398 F.3d 967 (7th Cir. 2005) is misplaced. (Def. Br. 6; Def. Supp. Br. 2.). J.W. Peters involved a Labor Management Relations Act pre-hire agreement dispute

12

between a union and an employer. Thus, the case involves neither of the ERISA specific considerations, nor the pension plan specific considerations that resulted in the Gerber Truck holding. In fact, the J.W. Peters court recognized this distinction (Id. at 977) and went on to reiterate the Gerber Truck conclusion that "nothing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement." Id. (citing Gerber Truck, 870 F.2d at 1152-53). Moreover, J.W. Peters does not hold that contracts entered by a union are void from the inception if the union signatory lacks majority support, which is the crux of Contractors' defense. On the contrary, the defense of lack of majority union support clearly falls within the holding of Gerber Truck and has repeatedly been held unavailing. Berry v. Garza, 919 F.2d 87, 90 (8th Cir.1990); MacKillop v. Lowe's Market, Inc., 58 F.3d 1441, 1444 (9th Cir. 1995); Agathos v. Starlite Motel, 977 F.2d 1500, 1506 (3d Cir.1992).

For all of the reasons discussed herein, the court will grant the Funds' motion for partial summary judgment, precluding the affirmative defenses set forth at paragraphs B and C of the defendants' answer to the amended complaint and any analogous defense. In view of the court's decision, it seems appropriate to conduct a conference with counsel for the parties to discuss what issues remain for trial.

**IT IS THEREFORE ORDERED** that the plaintiffs' motion for partial summary judgment is **granted.** The court will conduct a telephone scheduling conference with counsel for both parties to discuss further proceedings. The conference will be held on **June 29, 2005** at **9:30 a.m.,** and counsel shall advise the court in advance as to the names and direct telephone numbers of each

13

Case 2:02-cv-00924-AEG   Filed 06/16/05   Page 13 of 14   Document 124

attorney participating in the conference.  The court will place the call.

Dated at Milwaukee, Wisconsin, this <u>16th</u> day of June, 2005.

                            <u>s/AARON E. GOODSTEIN</u><br>United States Magistrate Judge